1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

SERGIO DE LA CRUZ,                    )   No. C 13-01442 BLF (PR)
                                      )
                Petitioner,           )   **ORDER DENYING PETITION FOR**
                                      )   **WRIT OF HABEAS CORPUS;**
     v.                               )   **DENYING AS MOOT REQUEST**
                                      )   **FOR APPOINTMENT OF COUNSEL;**
                                      )   **DENYING CERTIFICATE OF**
P.D. BRAZELTON, Warden,               )   **APPEALABILITY**
                                      )
                Respondent.           )
                                      )
_____      )

17         Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.[1]  The Court ordered Respondent to show cause why

19   the petition should not be granted.  Respondent filed an answer addressing the merits of

20   the petition and Petitioner filed a traverse.  Having reviewed the briefs and the underlying

21   record, the Court concludes that Petitioner is not entitled to relief based on the claim

22   presented and denies the petition.

23                              **PROCEDURAL HISTORY**

24         On August 12, 2010, a jury in Monterey County Superior Court found Petitioner

25

26

27

28

_____

[1]This matter was reassigned to this Court on April 17, 2014.

1  guilty of first degree murder and kidnapping.[2]  The jury also found true a special-

2  circumstances allegation (murder while engaged in a kidnapping) for purposes of a life-

3  without-parole sentence; and a firearm-use-causing-death allegation for purposes of a

4  consecutive 25-years-to-life sentence enhancement.  On September 14, 2010, the trial

5  court sentenced Petitioner to state prison for a term of life without possibility of parole,

6  with a stayed concurrent term totaling 33 years to life (eight years for kidnapping and the

7  consecutive 25-years-to-life sentence enhancement).

8        Petitioner appealed to the California Court of Appeal, which affirmed the

9  conviction and judgment in a reasoned judgment on May 8, 2012.  (Answer, Ex. 7

10  *hereinafter* "Op.".)  On August 22, 2012, the California Supreme Court summarily denied

11  a petition for direct review.  (Answer, Ex. 9.)  On April 1, 2013, Petitioner filed the

12  instant federal habeas petition.

13                      **BACKGROUND[3]**

14    Defendants were lovers. Their cell phone text messages outline a plot to
   kidnap and kill Andrade's husband, Jose Zarate. The plot came to fruition
15    one morning when Andrade drugged Zarate. Andrade then took her
   children to school while leaving the front door open. Delacruz arrived at
16    the home with an accomplice, hit Zarate, tied him up, wrapped him in a
   blanket, and put him in the trunk of Zarate's car. He took Zarate's gun
17    from the home and drove his car to a remote vineyard. He opened the
   trunk and shot Zarate in the forehead. Both defendants separately
18    confessed to Detective Alfred Martinez when confronted with their text
   messages.
19
   The People's theories were that Delacruz was guilty of first degree murder
20    and kidnapping as the perpetrator and Andrade was guilty of first degree
   murder and kidnapping as an accomplice.
21

22  (Op. at 2.)

23

24  _____

25    [2]Petitioner was tried with co-defendant Marisela Andrade.  The jury found Andrade
   guilty of first degree murder and kidnapping and also found true a special-circumstances
26    allegation (murder while engaged in a kidnapping) for purposes of a life-without-parole
   sentence.
27
     [3]The facts of this case are taken from the California Court of Appeal opinion in *People v.*
28  *Delacruz*, No. H036122 (Cal. Ct. App. May 8, 2012).  (Answer Ex. 7.)

1
2                                  **DISCUSSION**
3  A.    <u>**Standard of Review**</u>
4         This Court may entertain a petition for writ of habeas corpus "in behalf of a person
5  in custody pursuant to the judgment of a state court only on the ground that he is in
6  custody in violation of the Constitution or laws or treaties of the United States." 28
7  U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996
8  ("AEDPA"), a district court may not grant a petition challenging a state conviction or
9  sentence on the basis of a claim that was reviewed on the merits in state court unless the
10  state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or
11  involved an unreasonable application of, clearly established federal law, as determined by
12  the Supreme Court of the United States; or (2) resulted in a decision that was based on an
13  unreasonable determination of the facts in light of the evidence presented in the state
14  court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law
15  and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384–86 (2000),
16  while the second prong applies to decisions based on factual determinations, *Miller-El v.*
17  *Cockrell*, 537 U.S. 322, 340 (2003).
18         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the
19  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
20  question of law or if the state court decides a case differently than [the] Court has on a set
21  of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. "Under the
22  'unreasonable application' clause, a federal habeas court may grant the writ if the state
23  court identifies the correct governing legal principle from [the Supreme Court's]
24  decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*
25  at 413.  The federal court on habeas review may not issue the writ "simply because that
26  court concludes in its independent judgment that the relevant state-court decision applied
27  clearly established federal law erroneously or incorrectly." *Id.* at 411.  A federal habeas
28  court making the "unreasonable application" inquiry should ask whether the state court's

1   application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

2   The federal habeas court must presume correct any determination of a factual issue made

3   by a state court unless the petitioner rebuts the presumption of correctness by clear and

4   convincing evidence.  28 U.S.C. § 2254(e)(1).

5          The state court decision to which Section 2254(d) applies is the "last reasoned

6   decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Barker v.*

7   *Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).  When there is no reasoned opinion

8   from the highest state court considering a petitioner's claims, the court "looks through" to

9   the last reasoned opinion. *See Ylst*, 501 U.S. at 804.  The denial of review by the

10  California Supreme Court was a summary denial. (Answer Ex. 9.)  Thus, the last

11  reasoned opinion is the California Court of Appeal's opinion on direct review. (Answer

12  Ex. 7.)

13         The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

14  there is a heightened level of deference a federal habeas court must give to state court

15  decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v.*

16  *Richter*, 562 U.S. 86, 103–04 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011)

17  (per curiam).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a

18  highly deferential standard for evaluating state-court rulings' and 'demands that

19  state-court decisions be given the benefit of the doubt.'" *Felkner*, 131 S. Ct. at 1307

20  (citation omitted).  With these principles in mind regarding the standard and limited scope

21  of review in which this Court may engage in federal habeas proceedings, the Court

22  addresses Petitioner's claim.

23  B.     **Legal Claim and Analysis**

24         Petitioner raises one ground for federal habeas relief:  The totality of the

25  circumstances rendered Petitioner's waiver of his *Miranda* rights involuntary and

26  therefore violated his due process rights under the Fourteenth Amendment of the federal

27

28

1    Constitution.[4]  (Pet. at 4–9[5] and Traverse at 3–5.)  Specifically, Petitioner argues that his

2    will was overborne by the following circumstances:  Plaintiff suffered from a serious

3    kidney condition that made him desperate for a bathroom break; being handcuffed to a

4    chair for 15 hours; the detective engaging Petitioner in a lengthy conversation prior to

5    giving the *Miranda* warning; and the detective's promises of leniency if Petitioner told

6    the truth.  The Court of Appeal provided the following additional relevant background:

7              Police placed Delacruz in an interview room at 2:43 a.m. and handcuffed
             him. Detective Martinez entered the room at 5:40 p.m. and unlocked the
8              handcuffs. He told Delacruz that he was investigating a case and wanted to
             see what Delacruz could tell him. The two talked about Delacruz having a
9              health problem with his kidneys. Detective Martinez then asked Delacruz
             personal and family background questions. He thereafter informed
10

11           [4]In Petitioner's traverse, Petitioner also argues that his confession was involuntary. The
12   Court declines to address this argument for the following reasons.
             First, the voluntariness of a confession is a separate legal issue from the voluntariness of
13   a *Miranda* waiver.  A confession can be found involuntary even if there is a valid *Miranda*
14   waiver. *See, e.g., Miller v. Fenton*, 474 U.S. 104 (1985) (confession obtained after an hour of
     deceptive questioning may not have been voluntary even though validity of the defendant's prior
15   *Miranda* waiver was conceded).  In addition, voluntariness of a confession is not a factual issue
     entitled to a presumption of correctness under 28 U.S.C. § 2254(d).  Instead, it is a legal question
16   meriting independent consideration in a federal habeas corpus proceeding. *Miller*, 474 U.S. at
     115; *Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991) (federal court not bound by state court
17   finding that confession is voluntary).  In contrast, a state court's decision regarding the
     voluntariness of a *Miranda* waiver is entitled to deference on federal habeas review under 28
18   U.S.C. § 2254(d). *See Hernandez v. Holland*, 750 F.3d 843, 852–53, 855 (9th Cir. 2014) ("the
19   question is whether the California Court of Appeal was 'objectively unreasonable' when it found
     that the conversation between the [defendant and the detective] did not amount to an
20   'interrogation' under federal Supreme Court precedent."); *see also Collazo*, 940 F.2d at 415 n.4
21   (noting that the Supreme had not decided the question of whether federal habeas courts must
     accord the statutory presumption of correctness to state-court findings concerning the validity of
22   a waiver.).
             Second, nothing in this record suggests that Petitioner's claim that his confession was
23   involuntary is exhausted.  Petitioner did not present this claim to the California Supreme Court
24   (*see* Answer Ex. 8).  Accordingly, the Court may not consider whether Petitioner's confession
     was voluntary. *See* 28 U.S.C. § 2254(b), ©; *Rose v. Lundy*, 455 U.S. 509, 515–16 (1982)
25   (requiring federal habeas petitioners to exhaust all claims); and *Gulbrandson v. Ryan*, 738 F.3d
26   975, 993 (9th Cir. 2013) (a petitioner does not exhaust all possible claims stemming from a
     common set of facts merely by raising one specific claim).

27           [5] Citations to pages in the parties' filings will be to the page numbers applied by the
28   Court's electronic docketing system, which are found at the top of each page, and not to the page
     numbers assigned by the parties or found at the bottom of the page.

1   Delacruz that he had two rules for his interviews: one, that "we're talking
2   as men. We're adults and I respect you, you respect me ... and that respect
    comes from telling the truth.... We don't li—, we don't lie. If it's, if it's
3   something that ... I tell everyone that I talk to, if, if there's something they
    don't want to say, or ... it's better to say, 'I don't want to say' ... than to try
4   and make something up, or ... I mean, or just make up a story. It's ... if
    we're men, we're talking here as men and men only tell the, only the
5   truth"; and two, that "when here in this room ... my special room, uh, only
    truth comes out of here.... And there's no reason to, to say anything else
6   other than the truth.... Because I'm telling you, my job, uh ... my job is, is
    to talk to people and understand what they've gone through, what they're
7   going through, and document that information in a report.... I'm not here as
    a judge ... I'm not here to judge anyone ... and, and I say that because I'm
8   not a perfect person.... Uh, and I like to tell people that I'm not a perfect
    person so that they know that I'm not, I'm not sitting here, feeling superior
9   ... or that I'm better than the other person because I'm not, I know I'm not.
    OK?" Detective Martinez continued that he made mistakes when he was
10  young and could therefore see that most of the people he talked to were
    good people regardless of what crime was involved. He added that people
11  found themselves in situations because of forces that influenced them and
    mistakes. He posed that "the good thing about mistakes is that we have the
12  opportunity to repent of the things that we do." He said that his job was to
    write down what people told him because lawyers and judges do not have
13  the opportunity to talk and learn that the person in court is "really not a
    very bad person." He offered that "the circumstances they found
14  themselves in, out of necessity, uh, sometimes we're blinded by things, in
    what we're doing ... and we don't think about things, there are other things
15  that influence us, other people who influence us, and sometimes we don't
    have control over that." He added "That's why I do everything possible to,
16  in my reports, to put everything in that people can tell me ... uh, about their
    circumstances and why they are, they found themselves in the position that
17  they were in ... in my report.... And that way, the ones who read those
    reports later, uh, they can uh, have a, a better uh, understanding of that
18  person, of the personality ... and it's not just someone who is being accused
    of something." He repeated that "we all make mistakes in one way or
19  another" and related that he gets upset if he finds out that one of his
    children made a mistake without the child telling him first but, if before he
20  finds out, the child admits to a mistake "the punishment that you receive as
    a kid like that, it's always less." He continued that "And I'm telling you
21  this because people, like I told you, people in, in the justice system ... the
    judges, the lawyers who read those reports, they're also human.... And if I
22  can't help them understand ... the feelings, the reasons for someone who
    found himself in that position ... they can only see what's in black and
23  white.... That's the crime, that was what happened. But if they can see,
    that's the crime, but this person ... feels, feels regret, thinking about it now,
24  says, 'Mmm, I made a mistake, I was influenced by something, I was
    blinded by one thing or another,' then they also, being human ... react
25  differently." He offered "That's why I say, the truth is always better.... The
    truth makes us free.... Ok? If we don't tell the truth, we're captives.... It's
26  as if we formed a chain.... Every lie that we tell, everything that ... uh,
    mistake, and those are all mistakes ... that we all make, but we form our
27  chain. Ok? ... The truth will help us to get out of that chain and, and shake
    that chain off.... It unties it. Uh, the same way, another example would be
28  not ... and you have, you have dug holes before, right? ... You have made
    holes in the ground.... If you start making a hole in the ground and you're

1   not careful about mak—, you're not ... you make it so deep ... you get to a
point when it's so deep, and you haven't paid attention ... there's no way to
2   get out.... That's what we do when we try to not tell the truth.... We dig
that hole ... that hole gets really deep, we can't get out.... And there's no
3   wa—, and if ... the only way that we can ... we can help ourselves get out is
that someone else ... gives us a hand, gives us a, a rope, gives us a ladder,
4   and that comes through cooperation.... Ok? Cooperation comes through
people telling the truth.... Instead of lying. Uh, that's why I'm telling you,
5   it's very important.... Very important because the case that we're going to
talk about here is a very important case.... Uh, but I have to have
6   understanding. Uh, the case that I'm investigating ... uh, I'm investigating
the death of a, of a man.... Ok? And through my investigation ... I've talked
7   to people in this case ... this man's wife ... and with other family
members.... And through these people I have found out that they weren't so
8   faithful.... Ok? And you[r] name has come up ... about that, as having a
relationship ... with those people. The case, when ... any time that I have a
9   case, uh, it's like I suspect the whole world.... Because without knowing,
without knowing ... I suspect the whole world.... What we do as
10  investigators is try to look for all the ways, all, all the possible connections
there are ... because sometimes, through talking to people, we can get a
11  small clue or ... here and there.... It's as if we were doing a puzzle on this,
on this table.... And they're ... we know that puzzles have small pieces ...
12  and if we're missing a piece ... the picture never looks good.... That's why
we talk to every possible person.... Through my interviews I have found
13  out that, that, uh, uh ... well, that you know a lady named Marisela.... She
happens to be the wife of the man ... that, that ... someone killed.... And I
14  knew, I have noticed that she wasn't, she wasn't faithful.... He wasn't
either, but she wasn't faithful to, to her husband.... And I have to see the
15  different possibilities.... Ok? That's why I wanted to talk to you today."
Detective Martinez then advised Delacruz of his Miranda rights, Delacruz
16  waived his rights and agreed to speak with Detective Martinez, and
Delacruz implicated himself in the murder.
17

18  (Op. at 3–6.)

19      The California Court of Appeal found that there was no evidence that the manner

20  in which Detective Martinez engaged in small talk overbore Petitioner's free will and also

21  found that Petitioner's waiver of his *Miranda* rights was knowing and voluntary:

22      In overruling Delacruz's objection to the admission in evidence of the interview
with Detective Martinez, the trial court explained as follows: "I read very
23  carefully from Page 1 through 47 because that is when the pre-Miranda discussion
occurred, as well as the actual advisement of rights, which started on about Page
24  44 and went through 47 before they were concluded. [¶] In addition, I read—and
then thereafter, I was reading parts of the interviews to get some context on the
25  post-Miranda part of the interview, as well as the pre-Miranda. [¶] I have also
read *People versus Honeycutt,* 20 Cal.3d, 150, a California Supreme Court case. I
26  do believe the cases are different in their factual settings and circumstances. [¶]
And the questions and responses from Pages 1 through 43 would be estimated to
27  be over a period of 20 minutes approximately. [¶] They tell where the defendant
was born, his cell phone, phone contact, emergency information, his work, his
28  family, and the defendant started talking about an accident having been injured on

the job at one point in time. [¶] There is also a conversation from the detective about what he is looking for as the truth, not judging people and commenting about having people make mistakes and better to be open and truthful about it before he gets into the Miranda Rights. [¶] However, I still view the interview and the waiver of the Miranda Rights were involuntary [sic ] submitted notwithstanding the pre-Miranda discussion going on. [¶] There were no questions that would be eliciting a confession that I saw in any pre-Miranda interview. [¶] So I do find that the Miranda Rights were voluntar[ily] and intelligently waived by the defendant during the course of this interview. That objection is overruled."

Delacruz relies on *People v. Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*), and reiterates his challenge to the admission of the interview. He argues that his waiver of his *Miranda* rights was involuntary because the waiver resulted from a softening-up through disparagement of the victim and ingratiating conversation. He offers that Detective "Martinez engaged [him] in a lengthy conversation prior to giving the *Miranda* advisements," which "covered a wide range of topics" such as his kidney pain, occupation, and family. He continues that Detective Martinez then "exhorted [him] to tell the truth" and suggested that he "would be treated more leniently if he told the truth." He additionally asserts that Detective Martinez denigrated the victim by "telling [him] he had learned the man who was killed had been unfaithful." He further urges that he spent 15 hours handcuffed in the interview room before Detective Martinez advised him of his *Miranda* rights. According to defendant, "The combination of an extended period of incommunicado incarceration while in handcuffs, disparagement of the victim, softening-up of the suspect by ingratiating conversation and the suggestion of more lenient treatment if he 'told the truth' combined to render his waiver of rights involuntary." We disagree with Delacruz.

Any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. (*Miranda, supra,* 384 U.S. at p. 444.) "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals ... the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) The state must demonstrate the validity of the waiver by a preponderance of the evidence. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034.)

"'When reviewing a trial court's decision on a motion that a statement was collected in violation of the defendant's rights under *Miranda*, [citation], we defer to the trial court's resolution of disputed facts including the credibility of witnesses, if that resolution is supported by substantial evidence. [Citation.] Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda*'s rules.' " (*People v. Gurule* (2002) 28 Cal.4th 557, 601.) Contrary to defendant's argument, *Honeycutt* does not compel exclusion of his interview. The defendant in *Honeycutt* was arrested and placed in a patrol car without *Miranda* admonitions. The defendant refused to talk until he realized he was acquainted with the detective transporting him to the station. At the station, the defendant was hostile to a second detective, who left the room, and the first detective then engaged the defendant in a half-hour unrecorded conversation about past events, former acquaintances, and the victim. The detective "mentioned that the victim had been a suspect in a homicide case and was thought to have homosexual tendencies." (*Honeycutt, supra,* 20 Cal.3d at p. 158.) At the

1   end of the half-hour, the defendant "indicated he would talk about the homicide."
    (*Ibid.*) He then was read his rights, waived them, and confessed. Based on these
2   facts, the court concluded that "[w]hen the waiver results from a clever
    softening-up of a defendant through disparagement of the victim and ingratiating
3   conversation, the subsequent decision to waive without a *Miranda* warning must
    be deemed to be involuntary for the same reason that an incriminating statement
4   made under police interrogation without a *Miranda* warning is deemed to be
    involuntary." (*Id.* at pp. 160–161.)
5
    *Honeycutt* does not stand for the general proposition that every prewarning
6   conversation vitiates a subsequent knowing and voluntary waiver. (*See People v.
    Patterson* (1979) 88 Cal.App.3d 742, 751.) Rather, "*Honeycutt* involves a unique
7   factual situation and hence its holding must be read in the particular factual
    context in which it arose." (*Ibid.*)
8
    In this case, there was no "evidence suggesting that the manner in which
9   [Detective Martinez] engaged in small talk overbore [Delacruz's] free will."
    (*People v. Gurule, supra,* 28 Cal.4th at p. 602 [distinguishing *Honeycutt* ].)
10  In addition, Delacruz was not initially reluctant to talk as was the defendant in
    *Honeycutt*; he was not acquainted with the interrogating officer as was the
11  defendant in *Honeycutt*; he was not hostile to the interrogating officer as was the
    defendant in *Honeycutt*; and he did not agree to talk about the criminal
12  investigation before he had been advised of his *Miranda* rights as did the
    defendant in *Honeycutt*.
13
    Moreover, the defendant in *Honeycutt* was subject to two interrogation ploys to
14  elicit the waiver: (1) the "Mutt and Jeff routine where one officer acts
    aggressively and hostile while a second officer, when alone with the suspect,
15  seeks to gain his confidence by disapproving his partner's behavior"; and (2)
    "disparagement of the victim to induce in the defendant a feeling that his acts
16  were justified." (*Honeycutt, supra,* 20 Cal.3d at p. 160, fn. 5.) Here, however,
    there was no Mutt and Jeff routine and Detective Martinez's brief, general
17  statement regarding the Zarate's marital fidelity cannot be reasonably construed
    as suggesting that Zarate's killing was justified.
18
    *Honeycutt* is therefore distinguishable.
19
    We also observe that there is no evidence in the record to support defendant's
20  proposition that the lengthy time Delacruz spent handcuffed in the interview room
    before the interview overbore his free will. (*Cf. People v. Gurule, supra,* 28
21  Cal.4th at p. 602.) The transcript from which we have recounted Detective
    Martinez's *pre-Miranda* remarks to Delacruz indicates that Delacruz was
22  attentive, responsive, and engaging to those remarks.

23  And finally, inducements to speak the truth are not always, or necessarily,
    coercive. "The line to be drawn between permissible police conduct and conduct
24  deemed to induce or to tend to induce an involuntary statement does not depend
    upon the bare language of inducement but rather upon the nature of the benefit to
25  be derived by a defendant if he speaks the truth, as represented by the police.
    Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or
26  that "it would be better to tell the truth" unaccompanied by either a threat or a
    promise, does not render a subsequent confession involuntary.' [Citation.] ... [¶]
27  When the benefit pointed out by the police to a suspect is merely that which flows
    naturally from a truthful and honest course of conduct, we can perceive nothing
28  improper in such police activity. On the other hand, if in addition to the foregoing

1   benefit, or in the place thereof, the defendant is given to understand that he might
2   reasonably expect benefits in the nature of more lenient treatment at the hands of
    the police, prosecution or court in consideration of making a statement, even a
3   truthful one, such motivation is deemed to render the statement involuntary and
    inadmissible. The offer or promise of such benefit need not be expressed, but may
4   be implied from equivocal language not otherwise made clear." (*People v. Hill*
    (1967) 66 Cal.2d 536, 549.) Here, Detective Martinez did not offer defendant any
5   tangible benefit for speaking the truth. He implied no offer of lenient treatment by
    the police, prosecution, or court. At best, the exhortations to tell the truth are
6   ambiguous. But the trial court was not required to make the inference that the
    exhortations implied the existence of a police promise of lenient treatment.

7   We agree with the trial court that Delacruz's waiver of his *Miranda* rights was
8   knowing and voluntary. The subsequent interview was therefore admissible.

9   (Op. at 6–10).

10      In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a person

11  subjected to custodial interrogation must be advised that "he has the right to remain silent,

12  that any statement he does make may be used as evidence against him, and that he has a

13  right to the presence of an attorney." *Miranda*, 384 U.S. at 444. Once properly advised

14  of his rights, an accused may waive them voluntarily, knowingly, and intelligently. *See*

15  *id.* A valid waiver of *Miranda* rights depends upon the totality of the circumstances. *See*

16  *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). The government must

17  prove waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S.

18  157, 169 (1986). To satisfy its burden, the government must introduce sufficient

19  evidence to establish that under the totality of the circumstances, the defendant was aware

20  of "the nature of the right being abandoned and the consequences of the decision to

21  abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Although the burden is on the

22  government to prove voluntariness, a waiver cannot be held involuntary absent official

23  compulsion or coercion. *See Colorado*, 479 U.S. at 170 ("*Miranda* protects defendants

24  against government coercion leading them to surrender rights protected by the Fifth

25  Amendment; it goes no further than that."). The requirements of *Miranda* are "clearly

26  established" federal law for purposes of federal habeas corpus review under 28 U.S.C. §

27  2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005).

28

1    Based on a review of the record and the applicable law, the Court finds that

2 Petitioner fails to state a claim meriting habeas relief. Petitioner cannot demonstrate that

3 the state appellate court's opinion was contrary to, or an unreasonable application of, the

4 clearly established federal law. After evaluating the circumstances surrounding the

5 interrogation and reviewing the pre- and post-*Miranda* conversation, the state appellate

6 court found that there was no official – or unofficial – coercion or compulsion. (Op. at 9.)

7 Federal law, as determined by the United States Supreme Court, requires that there be

8 official compulsion or coercion to find a *Miranda* waiver involuntary. *See Colorado*, 479

9 U.S. at 170. Accordingly, the state appellate court's subsequent conclusion that Petitioner

10 voluntarily waived his *Miranda* rights is not contrary to, or an unreasonable application

11 of, clearly established federal law.

12    Nor was the state appellate court's opinion based on an unreasonable

13 determination of the facts. The facts do not support a finding that Petitioner's will was

14 overborne.[6] Petitioner was not initially reluctant to talk to the detective and he was not

15 hostile to the detective. (Op. at 9.) The detective first advised Petitioner of his *Miranda*

16 rights before asking him about the criminal investigation. (*Id.*) Petitioner was "attentive,

17 responsive and engaging to [the detective's pre-*Miranda*] remarks," despite having

18 waited in handcuffs for 15 hours prior to the interrogation. (*Id.*) The state appellate court

19 also reasonably concluded that the detective's brief statement regarding the victim's

20 marital fidelity could not reasonably be construed as suggesting that the victim's killing

21 was justified. (*Id.*)

22    Petitioner's ability to withhold the truth from the police and change his story to

23 benefit himself also imply that his will was not overborne. When Petitioner first spoke

24 with the police, he lied. He claimed to barely know co-defendant Andrade (Answer Ex. 1

25 at 400–02 ,404); denied being Andrade's lover (*id.* at 431); claimed to be Rosa's

26 boyfriend (*id.* at 400); and claimed to have no involvement in the murder (*id.* at 425–26,

27 

28    [6] Pursuant to 28 U.S.C. § 2244(e), the Court presumes that all determinations of factual
issues made by the state court are correct. 28 U.S.C. § 2244(e).

Order Denying Petition for Writ of Habeas Corpus; Denying COA
G:\PRO-SE\BLF\HC.13\01442De La Cruz_deny_HC.wpd          11

1   429–30, 433, and 437–38.)  After the detective confronted him with text messages,

2   Petitioner changed his story.  Even then, Petitioner claimed to have only driven the

3   victim's car to the vineyard where the victim's body was discovered, on the instructions

4   of an unidentified man.  (*Id.* at 456–58.)  Petitioner only confessed to the crime after the

5   detective confronted him with evidence of his communication with Andrade and informed

6   him that Andrade had already told the detective "everything."  Even after Petitioner told

7   the detective that he was guilty (*id.* at 461), Petitioner continued to lie and downplay his

8   involvement in the crime.  He claimed that he only intended to beat up the victim (*id.* at

9   463) and that he did not shoot him (*id.* at 465).

10          In addition, the record does not support Petitioner's contention that his serious

11  kidney condition rendered him so desperate for a bathroom break that he would have

12  agreed to anything.  The detective brought up Petitioner's kidney condition and Petitioner

13  informed the detective that although he had been in great pain the prior night and that

14  morning, he was now feeling fine.  (Answer Ex. 1 at 356–57).  Also, there is no record of

15  Petitioner asking the detective for a bathroom break.  Based on the evidence presented at

16  the state court proceeding, the state appellate court reasonably concluded that Petitioner

17  voluntarily waived his *Miranda* rights.

18          Moreover, assuming there was error, it was not prejudicial.  On federal habeas

19  review, reversal is only warranted if the error had a "'substantial and injurious effect or

20  influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637

21  (1993) (internal quotation marks and citation omitted); *see also Fry v. Pliler*, 551 U.S.

22  112, 120–22 (2007) (*Brecht* harmless error standard applies on collateral review by

23  federal habeas court where state appellate court failed to recognize the error and did not

24  review it for harmlessness).  The Court finds that the *Miranda* violation in this case did

25  not have a substantial and injurious effect or influence on the jury's verdict because the

26  prosecutor presented weighty, if not overwhelming, evidence of Petitioner's guilt apart

27  from Petitioner's confession.  Text messages between Petitioner and Andrade proved that

28  they were lovers.  Petitioner was linked to the phone number used in the text messages

1  through his payment of a service bill for the phone. (Answer Ex. 3 at 780 (service bill)
2  and Ex. 2 at 1925, 1929–31, and 250.) Petitioner also identified himself as the user of the
3  phone on one text and responded to other texts addressed to Sergio. (Answer Ex. 3 at
4  771, 776). The text messages also proved that Petitioner and Andrade were planning to
5  kill the victim and had made prior attempts to kill the victim on April 11, 2008, the day of
6  the murder. On April 4, 2008, Andrade texted Petitioner about giving the victim a paste
7  of pills so that the victim would be weak. (*Id.* at 773.) Petitioner responded: "give him a
8  lot – that way I'll fuck that idiot for you." (*Id.*) In a subsequent text, Andrade worried
9  about the victim learning that his gun was missing. (*Id.*) On April 7, 2008, Andrade
10  asked Petitioner about a silencer. (*Id.* at 776.) On April 7, 2008, Andrade asked
11  Petitioner if he had obtained chloroform. (*Id.* at 776.) On April 8, 2008, Petitioner
12  reported that his accomplices were stopped by police but that he avoided being stopped
13  because he was further behind his accomplices. (*Id.* at 777.) On the day of the murder,
14  April 11, 2008, Petitioner texted Andrade that he had the pills and that she should go to
15  the usual gas station: "This is the last opportunity." (*Id.* at 781.) She responded that she
16  had picked up the pills and would give the pills to the victim. The text messages are
17  overwhelming evidence of Petitioner's intent to murder the victim. In addition,
18  circumstantial evidence supports the theory that Petitioner and Andrade were lovers and
19  were hiding their relationship from the victim. Andrade's neighbor, Consuelo Gomez,
20  testified that she saw Petitioner parked at Andrade's house prior to the day of the murder
21  and that Andrade falsely introduced Petitioner has her cousin. The evidence of
22  Petitioner's guilt, outside of the confession, was weighty and supports the Court's finding
23  of harmless error. *See Brecht*, 507 U.S. at 639 (trial error was harmless where "the
24  State's evidence of guilt was, if not overwhelming, certainly weighty"). Petitioner is not
25  entitled to habeas relief on this claim.

26                                                   **CONCLUSION**

27          For the reasons set forth above, the petition for writ of habeas corpus is **DENIED**.
28  Petitioner's request for counsel is **DENIED AS MOOT**. (Docket No. 10.)

1    The federal rules governing habeas cases brought by state prisoners require a

2  district court that denies a habeas petition to grant or deny a certificate of appealability

3  ("COA") in its ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

4  2254.  Petitioner has not shown "that jurists of reason would find it debatable whether the

5  petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*,

6  529 U.S. 473, 484 (2000).  Accordingly, a COA is **DENIED**.

7    The Clerk shall close the file.

8    **IT IS SO ORDERED.**

9  DATED: _____April 3, 2015_____

10                                    BETH LABSON FREEMAN
                                      United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
G:\PRO-SE\BLF\HC.13\01442De La Cruz_deny_HC.wpd          14